The next case today is United States v. Christopher Brown, appeal number 20-1612. Attorney DeMaso, please introduce yourself on the record and then proceed. Good morning and may it please the court. I'm Chrissy DeMaso and I represent the appellant Christopher Brown. I'd like to reserve one minute for rebuttal. You may have it. Thank you. At 2 a.m. Mr. DeMaso, before you begin, could you just make sure that you let us know as you're beginning at 2 a.m. if the police officer was in uniform and in a marked cruiser? Yes, Your Honor. It was not a marked cruiser. It was an unmarked car and he was in what he described as a soft uniform, like a kind of a sweatshirt with the name of the police, but not a blue full police uniform. At 2 a.m. on a cold and rainy night, Mr. Brown was standing by a car. A police officer in an unmarked cruiser saw a gun in Mr. Brown's waistband. The police officer stopped his car, got out of the car, grabbed Mr. Brown's hands behind his back, held his hands there and would not answer Mr. Brown's question about why he was doing that. Mr. Brown pulled his hands away from the officer and yelled for help. When he pulled his hands away, the officer said, I think it's really quite an important point. I mean, I get the sense that you're trying to suggest that it's 2 a.m. and he is suddenly grabbed from behind and he could have understood that he was just being accosted by a civilian, if you will, that he had no way of knowing that this was a police officer. And so his reaction was perhaps a normal reaction to being attacked by someone at 2 o'clock in the morning. He has no idea who that person is. So is that, is it your contention that he did not know that this was a police officer who was grabbing him from behind and sort of telling him what to do? Is that your contention? I think that that could be part of what happened here. But I think that even if you accept that he knew that it was a police officer, even if you take the facts that way, he gets grabbed from behind and doesn't, truly doesn't know what's going on. And it's dark and it's cold and it's rainy. And the reason I'm focusing on these moments, these first moments of this... I'm sorry, what did the officer say at the time? Let me get the PSR just to get the exact... You should be prepared on this. You can submit a letter afterwards. Didn't the police officer identify himself? According to the PSR, it says that Coleman knew that Brown's criminal record prevented him from carrying a gun. He stopped his cruiser and approached Brown, grabbed Brown's hands and instructed him to place his hands behind his back. So the PSR does not say whether or not Officer Coleman, when he identified himself or what exactly he said. It says Brown immediately resisted and asked why he had to place his hands behind his back. And then Coleman explains, I'll tell you the reasons once you're in handcuffs. So perhaps by the point they're talking about handcuffs, but the facts in the PSR don't have Officer Coleman getting out and saying, what's your police hands behind your back? And nothing you put in the record at any point says that your client did not understand very soon that he was being handcuffed by a law enforcement officer. No, there's not a specific information about that, but even if we accept that... Okay, so let's go to the even if. Proceed, please. Thank you. Even if Mr. Brown knew immediately or very quickly that this was a police officer, we're still talking about a matter of seconds. And the reason I'm focusing on these seconds is because the government argued below and does not contest it here that by the time Officer Coleman grabs Mr. Brown around the waist, that the gun has gone from the waistband. And the government is relying heavily on the conduct that happened while the gun was at the waistband. And that conduct is, the arms are behind the back and he's pulling his arms out of that grip and he's yelling. That's the conduct. That's the exact conduct that has to be reckless and cause a substantial danger. And my initial, my first argument is that there's, that conduct was not sufficiently reckless or dangerous to merit the 3C 1.2 enhancement. Counselor, I mean, you're the, I think maybe you're arguing that once the, the judge was very focused on the presence of the gun and the risk that that posed in the form of death or serious injury. Is it your position that given that, I guess there's no dispute about this, that the gun was very quickly on the ground, that the judge, the mistake the judge made was focusing on the involvement of a gun and deciding that this was, that his conduct was, was reckless in the way it contemplated by the guideline? Is that essentially your argument? That, that is, that is a piece of it, your honor, that four minutes remaining. The, you know, Bell talks about there needs to be purposeful conduct with respect to a gun. And there was none of that here. However, the gun got to the ground. There's no reaching for the gun. There's no attempt to get the gun. And the, you know, the court, the district court talked about match it, which is a case that sort of references the idea that perhaps a gun could fire when dropped. And that is simply not something that the district court made a clear finding about. Counsel objects to the enhancement. And it, and when you look at the actual record here and the cases upon which... Well, the judge was worried about it. I mean, he talked about that sort of drop, fire. That was his concern, was it not? When he, he doesn't make a specific finding that this gun could have fired when dropped. He references match it. And then in concluding that the enhancement applies, he says, you know, I think that match it is similar and I'm leaving it there, but match it... So match it involved a gun drop. We don't know how the gun got on the ground here. The officer could be the person responsible for the gun dropping. So is that the point that you're trying to make? That's part of the point. The other part of the point, the point is that we, yeah, we don't know when or how the gun got to the ground. There are no findings about that. There are also no findings that this gun could have fired when dropped. And you dig into match it and the cases that match it relies on, it shows that in fact, the opposite is likely true. Ms. DeMesa, let's assume there is a gun on the ground. It's being carried by, as the officer knows, a felon with a long track record of violence. It's 2 a.m. in an area, very next, right next to apparently an apartment building. I don't know if it's a housing project. Your client continues to struggle with the police officer. In fact, gets away for a bit until the officer... Why isn't the concern that your client was going to try to retrieve the gun and there would be further scuffling over that? Why isn't that a perfectly obvious concern for the trial judge to have had here? As I read his statement, I thought that was part of it. It was not merely the risk to the officer. It was the risk to having a gun very close to a building where people lived. And indeed, your client calls to a resident in the building and asks her to come down and open the door so he can escape from the police there. And there is a tussle there. So why doesn't this entire situation at least rationally suggest that there is a real risk of injury to a number of people here, not just the police officer? I don't think that the gun being on the ground carries a sufficient risk in these circumstances. And the... I'm sorry, you've ignored my... He's still not apprehended. He's still not in handcuffs. He can reach down and get the gun. You seem to be advocating for a rule that we should ignore the fact that there is a loaded gun on the ground while the police officer is involved in a fight with the defendant trying to get him into handcuffs. The struggle lasts approximately... Entirely, it lasts approximately two minutes long, and it moves away from the site where the gun is later found. There's no indication that Mr. Brown ever tried to return to the gun, that he ever tried to go back to that location. That isn't the risk there, whether he tries to go back to the gun or not. I think that that's where you have to look to the overall context of the situation, that it was 2 a.m., it was dark and rainy and cold. And the video involved in this case showed that no one was around. But he didn't... I'm sorry. It... Nobody was on the street, but there were people in the building, and he goes there, doesn't he? And he calls to someone to open the door, and that person comes and opens the door. Isn't that correct? Yes, that did happen. And I don't think that the gun was away at that point. I don't think that the gun being away on the ground at that point causes sufficient danger to merit the application of this enhancement. I believe my time has elapsed, if there's... Yes, you have a minute reserved later. Thank you. Thank you, Attorney DeMaso. Please mute your device at this time. And Attorney Eisenstadt, please introduce yourself on the record and proceed. May it please the court, Karen Eisenstadt on behalf of the United States. The situation we have here is there's a close physical struggle between the defendant and officer right outside of an apartment building. The officer is trying to hold onto the defendant's hands to cuff them. The defendant is struggling to get away and simultaneously calling for someone in the building to come open the door. And in the midst of this physical struggle, the defendant's loaded handgun is dislodged from his waistband and falls to the ground. And as Judge Lynch just pointed out, also, there's a struggle that continues for some time after this. And there's also still present. We don't know who that person was, but also present on the scene while all this was occurring. The district court did not find on all of these facts, did not clearly err in finding on these facts that the defendant's conduct had recklessly created a substantial risk of death or serious bodily harm to another person. The defense here is trying to draw a line that the defense is trying to say that the defendant needed to take a purposeful action toward the gun or the guideline doesn't apply. But what the guideline says is that the conduct needs to be reckless, not purposeful. And indeed, the guideline further says that if a higher degree of culpability is present, an upward departure beyond the two-level increase may be warranted. When we look at Bell, this court's precedent, that does not say that a purposeful action toward the gun is required either. What Bell tells us is that when we're looking at a situation where there's a loaded gun, you need to find an actus reus that creates the substantial risk discussed in the guideline. But the actus reus required is often not very high because a loaded gun truly is inherently quite dangerous. Although Bell gave as an example as the type of actus reus that could satisfy the reaching for the gun, it didn't say that a purposeful act is necessary. And the government submits, Bell does not have said that consistent with the text of the guideline, which is that what we look for is reckless conduct or purposeful conduct. Counsel, would you agree that the court's on the risk posed by the gun seemed to be that sort of drop, fire phenomenon? The court was explicit about that. And I understand defense counsel be saying, well, if that's the phenomenon you're concerned about, there should at least be some evidence that that phenomenon could actually play out. And so we have these representations that just was not, that phenomenon could not play out for the reasons given in the reply brief. Is that relevant at all? Should the court, if it was focused on that phenomenon, have asked for evidence that this drop, fire thing could occur? I think it's useful in considering defense counsel's argument here, the context in which the argument is arising. So first of all, the government disagrees with the defendant that the district court did not make a finding about drop, fire. The district court said to defense counsel, one of the things about Matchett that they spent a lot of time on was this so-called drop, fire aspect. And I think that's what judge Lopez is referring to. The court then said, in other words, when the gun fell to the pavement, it had the capacity to fire, which is awfully similar to this situation. And then the court asked defense counsel, gave the floor back to defense counsel to respond to that inference. And on that point, the defense counsel did not question the inference, but accepted it. And then at no other point during the sentencing hearing did defense counsel suggest, we think that inference is implausible, or we think more factual finding is necessary. And that, of course, before the district court is when those factual issues could have been resolved. So that, in our minds, is a forfeiture. And then when we look at what's happening on appeal, really in the first time the defendant's reply brief, are we getting any sort of developed claim that the district court made an error in drawing that inference? So the government's position is the argument is also I mean, when you look at the opening brief, it's not clear if there's a claim of error. Counsel, just to probe that a little bit more, was there evidence on the record to support that the gun was capable of firing at the time it dropped? I think the situation here is that there is no evidence of any specific features that would make this loaded gun more likely to fire when dropped than sort of an ordinary loaded handgun. But there is also no evidence of any specific safety features, trigger lock, or anything engaged on this gun that would make it less likely to go off than an ordinary loaded handgun. So in this situation, the government's position is... In the absence of such evidence, is it a reasonable inference that it was capable of being fired? Is that a more probable inference than the other? The government's position is that what the inference the court drew here was a plausible inference. Four minutes remaining. When you look at a situation of a person carrying a handgun, presumably for defense or some other purpose, we would assume normally that they'd carry it in such a way that it is more or less ready to fire. That's the purpose of having the handgun. And I think it is significant, not only that the court drew the inference, but that it told defense counsel it was drawing the inference and asked defense counsel to respond to that point. So if defense counsel had a concern that the inference was not sufficiently supported, that was the time to draw that to the attention of the court so factual findings could be made. And defense counsel here accepted the inference and argued based on that inference. So the district court had no inkling that defense argued the inference is not supported, you need to make further findings. So I think that's why the context is helpful in understanding what inference the court was making and what the posture of that argument is now on appeal. When you look at the reply brief, defense is now bringing in information from the manufacturer's website. It might be about a slightly different gun. None of that stuff is in the record. So at this point, if the defense can't establish a reversible factual error, then the facts on appeal are as the district court found them. And the government's position is the district court clearly did find that this gun, when it fell to the pavement, had the capacity to fire. Is that, is it true of you that as the district court analyzed, that's the only way in which the presence of the gun would support the application of the enhancement? I mean, the court itself did not suggest any other way in which that, the presence of the gun might have made this, might have informed the judgment that the conduct here was reckless. It's just this drop fire phenomenon. Is that correct? I mean, there's no suggestion that he was reaching for the gun. There's no suggestion that the officer was focused on that possibility, or maybe there was. What is the state of the record on that? That involvement of the gun in that fashion? Based on the district court's reasoning and its reference to match it, it appears what the district court is doing is looking at the struggle and the drop as the primary. Those are the pieces that make this case analogous to match it. And from the out-of-circuit cases that the government cited in its brief, it's clear that those, both of those two things can create risk with a loaded gun. And I think the reasons are fairly obvious. There was a concern by the officer, based on the record, that at some point Brown might reach for the gun, but I don't think there's any evidence that he actually did reach for the gun. So in the record, it states that the reason after Brown was able to get his hands free, the officer reached around his waist to try to find the gun was the concern that given how violent the resisting of arrest was in the situation, that that might be the moment he's about to reach for his gun. So that is, I think, the state of the record in terms of reaching for the gun. I think the other aspects of the gun being present on the ground, sort of the defendant's behavior after that time, those are all relevant to sort of understanding the overall context of what's going on here, how violent, how physical the struggle was. That's where I think the grabbing of the taser, the throwing the officer, those things are all, I think, relevant to looking at the overall picture of risk here. And so I think that, you know, the district court considered all of those things, but certainly in relying on Matchett and stating that he was relying on Matchett, I think it was primarily an issue of a struggle and a drop. Counsel, I know Appellant did not raise this breach of the plea agreement issue, but she may want to use her rebuttal time to respond. I'd just like to ask you quickly, I mean, we do have this surface to the agreement and there does seem to be that quality here in which there is the formal disclaimer, no, we're not asking for the application of this enhancement, but then when you get to the sentencing itself and the argument for the factors the court should consider in deciding what the guidelines sentence should be, the argument is very much the kind of argument that would apply to the application of this enhancement, how dangerous the situation was, how reckless the defendant's conduct was. And so you have, and the court immediately takes the position, yes, the enhancement has to apply. I mean, why isn't this very much a sort of lip service type of situation where we're not asking for the application of the enhancement, but Judge, you should understand that all the circumstances here really fit exactly with that enhancement contemplates. Why don't we have this situation here? I think what really distinguishes, two things distinguish this case, I think, from the types of lip service cases that Your Honor is referencing. The first is that the hallmark of those cases is that the government's discussion of the plea agreement is somehow begrudging or apologetic, or the government's expressing some sort of regret or sense that the agreement was too low. And there's no whiff of that here anywhere in the record. I think the point you're making about the sentencing hearing, all of those arguments were after the court had decided to impose enhancement. Those were our 3553A arguments. And that's the same thing that happened with the sentencing memorandum. We said, I think, at least three times that this is an 3553A factors. And it was a proper argument under those factors. So I think in this situation, there's just simply no basis for finding a breach. We're arguing these facts for the permissible purpose. And under the Irizarry Rosario case, I think that's very helpful in understanding that you cannot make an argument where the government's very clear that it's arguing factors for the permissible purpose, that there's no other way to take it that it must have been for the ill-intentioned purpose. I mean, this court was very clear in rejecting that argument. Where the government is not saying anything begrudging about the plea agreement that stands resolutely behind it, that is not a breach. Okay, any further questions? No. Thank you, counsel. At this time, Attorney Eisenstadt, please mute your audio and video. And Attorney DeMaso, you have one minute of a rebuttal. Please reintroduce yourself on the record. Chrissy DeMaso for Christopher Brown. I would like to address one point that arose during the government's argument and then turn to the Canada violation quickly. When it comes to the question of which inference about the gun is more reasonable, whether guns can fire when dropped or cannot, I'd point the court to the cases cited in Matchett, both of which are products liability cases involving guns that were wild, wild rest, replicas, and those had the capacity to drop fire. And both of those cases talk about how modern firearms do not carry that danger. So that making guns that had the risk of firing when dropped was a products liability issue, entitling those plaintiffs to relief. Turning to Canada, the government here made a reasoned decision to enter a plea agreement saying that this enhancement did not apply. Their brief references to the total offense level and the sentence they were requesting were mere technical compliance, lip service. It is not too much to ask that the government explain its reasoning, why it entered into that agreement. It could have done that in many ways. And instead, in its sentencing memo, and again at sentencing, it presented argument, basically arguing for this enhancement. And to the extent that the government... In fact, the court had to consider all of that under the 3553A. You suggested earlier that this court needs to put the government on an obligation to explain why it enters plea agreements. I don't believe there is any support in the case law. That is a matter of prosecutorial discretion. That's a very different issue than whether one can say that the government violated the terms of the plea agreement. So again, in terms of violation of the plea agreement, what is your best argument? My best argument is that where the government entered into a plea agreement that did not include this enhancement, and then it did state that, you know, the table of the total offense level that we agree on is 17, and this is the number that we're asking for based on that, but then it went on to present argument using the exact language of the contested enhancement. There are ways that it could have presented 3553A factors while simultaneously explaining that it did not believe that this enhancement applied, explaining why a plea agreement that did not include this enhancement was appropriate. It did not do that, and because it did not do that, its references to the plea agreement are grudging, are lip service, are technical compliance. Counselor, I mean, you're making a pretty important argument there. You seem to be saying that it's not enough for the government to say we are not asking for the application of the enhancement. You seem to say the government has to go on to try to persuade the judge that the judge should not apply the enhancement. That's a big additional step. Is that in fact what you're saying, that they should have tried to dissuade the judge from the enhancement? I think there are lots of different ways that the government could have complied with the plea agreement here, and to focus very narrowly on what the government did here. It basically says the number. It says, yeah, we agree to total offense level 17, and this is the sentence we're asking for based on that. It does not say anything else. The sentencing memo doesn't acknowledge that the PSR had applied an enhancement that was not included in the plea agreement. There's no even acknowledgement that there is this dispute out there, and the government's side... Do you disagree with the government that the court adopted the enhancement before the government made the argument that has what you consider the offensive language in it? It seems like chronology would matter here. The offensive language occurs first and really glaringly in the sentencing memo, which certainly came before any decision that the court made. But as to the argument at sentencing, the government's representation as to the order of argument is correct, isn't it? It is, but I still think that it's... We get your point that the sentencing memo came first. Is there anything else? Yes, one quick point. It's just that even things that came after the enhancement are context to show how the government was or was not adhering to the plea agreement. In this case, we would argue that they did breach that agreement by paying mere lip service to it. Okay, thank you very much. That concludes argument in this case. Attorney D'Amaso and Attorney Eisenstat, you should disconnect from the hearing at this time.